United States District Court
Southern District of Texas
**ENTERED**
August 11, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PETROBRAS AMERICA, INC., | § | |
| | § | |
| Plaintiff and Counterclaim Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-19-1410 |
| | § | |
| SAMSUNG HEAVY INDUSTRIES, CO., | § | |
| LTD., | § | |
| | § | |
| Defendant and Counterclaimant. | § | |

**MEMORANDUM AND OPINION**

For years, lawyers bringing mine-run breach of contract cases have tacked on claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, despite the absence of any systematic corruption.[1] This is not one of those cases. This case actually involves systematic corruption on a large scale—Samsung's bribery of a state-owned enterprise's employees to secure a contract to build a drillship worth hundreds of millions of dollars, with operating costs of over $400,000 a day. The corruption has already resulted in a large arbitration award against Samsung and criminal convictions for the individuals, employees of the plaintiff's parent company, who took the bribes.

---

[1] *See, e.g.*, *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 836 (5th Cir. 2021) (affirming dismissal of RICO claim) ("Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud. It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO.") (quoting *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999)); *Shannon v. Ham*, 639 F. App'x 1001, 1004 (5th Cir. 2016) ("[The plaintiffs] wish to convert claims that would otherwise sound in Texas contract or statutory law into criminal acts encompassed by RICO.") (citation omitted); *Zastrow v. Houston Auto Imps. Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015) ("The district court properly granted summary judgment on [the plaintiff's] breach of contract claim dressed in civil RICO garb.").

Despite the corruption that gave rise to this suit, the court finds that the elements necessary for the plaintiff to recover under RICO are not met. The court also finds that the defendant's counterclaim is not viable as a matter of law. The reasons for these rulings are set out below.

## I.      Summary of This Dispute

Petrobras America ("Petrobras America"), an affiliate of the Brazilian state oil company Petróleo Brasileiro, S.A. ("Petrobras"), sued Samsung Heavy Industries to recover damages allegedly caused by Samsung's bribery of Petrobras officials to secure a drilling-services contract between Petrobras International Braspetro B.V. ("Braspetro") and Pride Global ("Pride").[2]  Under this contract, Petrobras America paid Pride at least $600 million. Pride demanded this contract before agreeing to commission and purchase from Samsung an ultra-deepwater drillship,[3] the DS-5. Around the time that Samsung finished building the DS-5, Braspetro assigned the drilling-services contract to Petrobras America. According to Petrobras America, it had no business need or justification for this expensive contract. Petrobras America argues that it would not have been saddled with this contract but for the bribes Samsung paid to the two Petrobras officers who arranged for the contract's execution.

Petrobras America has moved for summary judgment, arguing that the undisputed facts show that, as a matter of law, Samsung is liable under RICO. (Docket Entry No. 177). Samsung has cross-moved, arguing that Petrobras America cannot succeed on its RICO claims. (Docket Entry No. 181).

---

[2] Pride was acquired by Ensco plc in May 2011. (Docket Entry Nos. 177 at 3 n.2, 181 at 6 n.1). Neither party has indicated that this acquisition is material to the present dispute. The court refers to the company as "Pride" throughout this opinion.

[3] The parties use both the terms "drillship" and "rig" to describe vessels such as the DS-5. Because the nomenclature for the DS-5 is not at issue in this lawsuit, the court uses those terms interchangeably.

After Petrobras America declared the Pride contract void because it was the product of bribery, Pride received an arbitral award of $180.4 million against Samsung for its role in the bribery scheme.  Pride and Samsung then settled.  Samsung alleges in its counterclaim that Petrobras America is liable in contribution for the money Samsung had to pay to Pride to satisfy the post-award settlement.  Petrobras America's motion seeks dismissal of Samsung's counterclaim.

The parties have extensively briefed the two motions for summary judgment.  (Docket Entry Nos. 177, 181, 194, 199, 208, 215, 219-1, 227, 230).  The court held a hearing on the motions on July 24, 2023.  (Docket Entry No. 233).  Based on the briefing and summary judgment record, the arguments of counsel, and the relevant law, the court grants Samsung's motion for summary judgment, denies Petrobras America's motion with respect to its RICO claims, but grants the part of Petrobras America's motion seeking dismissal of Samsung's counterclaims.  The reasons for these rulings are set out below.

## II.    Background[4]

Petrobras is the national oil company of Brazil, and the Brazilian federal government is its controlling shareholder.  (PAI SUF ¶ 18; SHI SUF ¶ 2).  Braspetro is organized under the laws of the Netherlands and is a wholly owned subsidiary of Petrobras.  Petrobras America is a Delaware-incorporated wholly owned subsidiary of Braspetro.  (PAI SUF ¶¶ 17–18; SHI SUF ¶ 1; July 24, 2023 Hearing Transcript ("Tr.") at 7:16–21).  Samsung Heavy Industries is organized under the

---

[4] Background facts are taken from the parties' statements of undisputed facts ("PAI SUF" and "SHI SUF"), including, when relevant, the opposing party's responses and objections.  (See Docket Entry Nos. 178, 180, 192, 193, 195, 210, 212).  Specific documents in the record are also referenced where appropriate.  The court does not believe that Petrobras America's objections to certain summary judgment evidence, (Docket Entry Nos. 192, 216 (Samsung's responses to Petrobras America's objections)), are material to the outcome of the parties' motions.

laws of the Republic of Korea and, among other things, builds and sells ultra-deepwater drillships. (PAI SUF ¶ 20; SHI SUF ¶ 64).

### A.   Petrobras

#### 1.   Corporate Governance

Petrobras is overseen by a board of directors, which has the authority to nominate and remove executive officers of the corporation.  (SHI SUF ¶ 3).  Petrobras's corporate bylaws vest managerial control in a "Board of Executive Officers," also called the "Executive Board."  (*Id.* ¶¶ 6–7).  During the time in question, the Executive Board had seven members. (*Id.* ¶ 21).  Among other things, the bylaws tasked the Executive Board with the responsibility "to authorize the acquisition . . . of real-estate goods, ships, and maritime drilling and production units."  (*Id.* ¶ 9).

Two of the Executive Board's seven members during this period were Nestor Cerveró and Renato Duque.  From February 2003 until February 2008, Cerveró was the head of Petrobras's International Division and the chair of Petrobras America's board of directors.  (PAI SUF ¶ 13; *see also id.* ¶ 21 (identifying relevant individuals); SHI SUF ¶¶ 10–11).  In these capacities, Cerveró had the authority to execute contracts on behalf of certain Petrobras entities.  (SHI SUF ¶ 15).  From 2003 until February 2012, Duque was a member of the Executive Board and Petrobras's Chief Services Officer.  (PAI SUF ¶¶ 14, 21; SHI SUF ¶ 16).  Duque apparently did not hold a position in Petrobras America.  From time to time, Duque acted as an agent for other Petrobras entities.  (SHI SUF ¶ 19).  Cerveró's and Duque's employment duties included procuring drillships in compliance with company policy and relevant law.  (*Id.* ¶ 20).

#### 2.   Petrobras and the Oil Market in the Relevant Period

From 2004 to 2007, Petrobras sought to expand its global presence through deepwater drilling projects in various locations.  (*Id.* ¶¶ 39, 47–48, 50, 94; *see also id.* ¶ 46 ("We consider our core activities to be . . . deepwater exploration and development off the U.S. Gulf Coast,

Colombia, and West Africa.") (quoting Petrobras's 2006 Annual Report); *id.* ¶ 127 (testimony that Petrobras sought drilling rigs for both Brazilian and international use)).   To meet its goals, Petrobras needed greater deepwater drilling capacity; at the time, its domestic Exploration and Production Division had only a single "ultra-deepwater" drilling rig, that is, one capable of drilling in depths of over 9,000 feet.   (*Id.* ¶¶ 40, 42).   In 2008 and 2009 public filings, and in a 2010 earnings call, Petrobras cited its lack of domestic drilling capacity as a risk to, or limit on, its business.   (*Id.* ¶¶ 117, 128, 130).   Beginning in 2006, Petrobras began to increase its deepwater drilling capacity by acquiring usage rights to four ultra-deepwater rigs.   (*Id.* ¶ 44).   Between 2008 and 2010, Petrobras acquired rights to 22 additional ultra-deepwater rigs.   (*Id.* ¶ 45; *see also id.* ¶¶ 123–125 (mentioning specific drillships)).

Other industry players also sought to expand their deepwater drilling capacity.   (*Id.* ¶¶ 51, 57; *see also* ¶¶ 219, 222 (stating that there were 32 ultra-deepwater rigs in service in 2006 and 107 in 2011).   The push for more deepwater drilling capacity reflected the generally rising price of oil between 2002 and 2014, temporarily interrupted by the 2008 to 2010 recession.   (*Id.* ¶¶ 49, 60–61, 216–18).   These market dynamics led to the greater use of existing rigs and higher contract prices for their operation.   (*Id.* ¶¶ 52–53, 58–59, 62, 220, 223).   The market's focus on deepwater capacity also led to increased competition between different oil producers and contractors for new rigs.   (*Id.* ¶¶ 63, 221).

In 2014, the price of oil fell from about $105 per barrel in June to less than $60 in December, a decline that continued into following years.   (*Id.* ¶¶ 225–26; *see also* ¶ 233 (stating that the price fell to $33 per barrel in January 2016.).   As a result, oil companies, including Petrobras, began to reduce their drillship fleets.   (*Id.* ¶ 229–232).

5

### B.      The DS-5 and the Drilling Services Contract

Samsung built the DS-5, the drillship at the center of this dispute, as an "ultra-deepwater" drillship capable of drilling in depths of over 10,000 feet.  (Docket Entry Nos. 51 ¶ 19 n.3, 85 ¶ 19).

#### 1.      Petrobras's Acquisition of Samsung Drillships before the DS-5

Samsung had previously constructed two other ultra-deepwater drillships for Petrobras entities, the *Petrobras 10,000* and *Vitoria 10,000*.[5]  (PAI SUF ¶ 2; SAI SUF ¶ 65; *see also* PAI Response to SHI SUF ¶ 65 (stating that the Petrobras entities party to the *Petrobras 10,000* and *Vitoria 10,000* transactions were Braspetro and Petrobras Oil and Gas B.V., respectively)). Beginning in 2006, Samsung secured the contracts to build the *Petrobras 10,000* and *Vitoria 10,000* by paying bribes to Petrobras officials.  (PAI SUF ¶¶ 2, 4, 28–31).  Samsung paid these bribes through inflated "commission" payments to an entity owned by Samsung's broker, Julio Gerin de Almeida Camargo, who paid Cerveró and Duque, and potentially other Petrobras employees, from the inflated commission amounts.  (PAI SUF ¶¶ 4–8; SHI SUF ¶¶ 67, 70–71, 76–78).

The price Petrobras paid for the drillships was inflated to include the commission payments, the existence and nature of which were not directly disclosed to Petrobras.  (PAI SUF ¶¶ 6, 40, 55).  Cerveró and Duque, other Petrobras employees, and Brazilian politicians allegedly shared Samsung's commission payments related to the *Petrobras 10,000* and *Vitoria 10,000*.  (SHI SUF ¶¶ 77–78).

---

[5] *See generally* PAI SUF ¶¶ 22–69 (detailed description of the *Petrobras 10,000* and *Vitoria 10,000* bribery schemes).

###	2.	The DS-5 Bribery Scheme

Samsung did not involve Camargo in the bribery scheme for the DS-5.  In 2006, Samsung opened discussions with Pride about new Brazilian projects.  (PAI SUF ¶ 70).  The parties discussed the possibility of Pride purchasing from Samsung one or more drillships, which Pride would then charter to Petrobras.  (*Id.*).  Pride introduced Samsung to its Brazilian agent, Hamylton Pinheiro Padilha Júnior.  (*Id.* ¶¶ 71–72).  Padilha met with Cerveró and Duque in early 2007 to discuss the possibility of a contract between Pride and Petrobras for a "newbuild" drillship. (*Id.* ¶ 74).  Samsung's potential deal with Pride required a contract between Pride and Petrobras or Braspetro.  To get that contract, Samsung funneled bribes to Cerveró and Duque, the two Executive Board members who would work to approve the drilling services contract between Pride and Petrobras for the DS-5.  (PAI SUF ¶¶ 10, 76; SHI SUF ¶¶ 76, 81–82).  The Samsung executives involved in the negotiations knew that Padilha would bribe officials at Petrobras entities other than Petrobras America.  (PAI SUF ¶¶ 79, 82, 130–131; SHI SUF ¶ 131).

Ultimately, Samsung paid $20 million in "commissions"—bribes—to two entities controlled by Padilha and a man named Raul Schmidt Felippe Júnior.  (PAI SUF ¶ 12; *see also id.* ¶¶ 117–21 (detailing the payment of $20 million in "commissions").  Padilha and Schmidt distributed part of the $20 million to Cerveró and Duque.  (*Id.* ¶¶ 122–129).

###	3.	The Pride-Petrobras and Pride-Samsung Agreements

In May 2007, Petrobras and Pride executed a letter of intent agreeing to negotiate a contract to charter the DS-5.  (SHI SUF ¶ 80).  Cerveró signed the letter on behalf of Petrobras.  (*Id.*).

In June 2007, Samsung and Pride signed an option agreement for the purchase of the DS-5.  (PAI SUF ¶ 75).  Schmidt told Padilha that a commission payment would be required for Petrobras to contract with Pride for the DS-5.  That information was communicated to Samsung. (SHI SUF ¶¶ 86–87).  Samsung paid Padilha an inflated $20 million commission, and Padilha

worked with Schmidt to ensure that Petrobras executed a drilling services contract with Pride. (PAI SUF ¶¶ 81–82). Samsung knew that the $20 million "commission" was to pay bribes to Petrobras officials. (*See e.g.*, *id.* ¶ 103). Padilha and Schmidt assisted in Samsung's payment of the bribes to Cerveró and Duque. (PAI SUF ¶¶ 122–125, 128–129). Samsung added the $20 million payment to the cost of the drillship. (PAI SUF ¶ 87; SHI SUF ¶ 89). In October 2007, Samsung told Pride that the higher price was the result of an increase in labor costs and a less favorable exchange rate. (PAI SUF ¶ 89). The $20 million commission agreement was formalized by Samsung, a company controlled by Padilha, and a company controlled by Schmidt. (PAI SUF ¶¶ 99–101). Before 2016, no employee of any Petrobras entity saw the communications in which Samsung falsely represented to Pride the reason for the $20 million price increase. (SHI SUF ¶ 91).

In December 2007, Petrobras and Pride executed a memorandum of understanding for a drilling services contract between Braspetro and Pride. (SHI SUF ¶ 95). That same month, the Petrobras Executive Board tentatively approved the DS-5 transaction. (PAI SUF ¶ 110; SHI SUF ¶¶ 99–100; *see also* SHI SUF ¶ 103 (stating that the Executive Board reviewed information about the proposed transaction)). Cerveró signed both the agreement and the memorandum of understanding on behalf of Petrobras. (SHI SUF ¶¶ 95, 100). Around the same time, Samsung contracted with Pride to construct the DS-5 for $636,040,000. (PAI SUF ¶ 111).

The drilling services contract (the "Contract"), a five-year charter agreement between Braspetro and Pride, was finalized and executed in January 2008.[6] (PAI SUF ¶ 112; SHI SUF ¶¶ 104, 106–107). Cerveró signed the Contract as attorney-in-fact for Braspetro. (SHI SUF

---

[6] The Contract was approved by the Petrobras Executive Board the next month. (*Id.* ¶ 109).

¶ 108).  Petrobras America was not a party to the Contract and did not participate in the discussions leading to its execution.  (*Id.* ¶¶ 97–98).

The Contract permitted Braspetro to assign it "to any of its Affiliates" merely by providing Pride with written notification.[7]  (Docket Entry No. 176-31 (the Contract) ¶ 23.2.1).  Assignment to a third-party required Pride's written consent, "which consent shall not be unreasonably withheld."  (*Id.* ¶ 7.1.1 (referenced by ¶ 23.2.2)).

During negotiations about the Contract, certain Petrobras employees questioned the company's need to charter the DS-5.  (PAI SUF ¶¶ 95–97).  In particular, a Petrobras geologist, Lincoln Rumenos, expressed in emails his opinion that Petrobras did not need a third drillship.  (*Id.* ¶ 95).

### 4.    The DS-5 in Service

As Samsung built the DS-5, Petrobras considered where it should be deployed.  Possible destinations included Angola and the Gulf of Mexico.  (SHI SUF ¶¶ 132–135).  In July 2011, before delivery of the DS-5 to any Petrobras entity, Braspetro assigned the drillship to Petrobras America for use in the Gulf of Mexico.  (PAI SUF ¶ 133; SHI SUF ¶¶ 136–139; *see also* Docket Entry No. 182-6, Exh. 52 (the "Assignment Agreement") at 2).  Alexandre Penna Rodrigues and Orlando Azevedo signed the Assignment Agreement on behalf of Braspetro and Petrobras America, respectively.  (SHI SUF ¶ 140).  There was no bribery involved in the execution of the

---

[7] The Contract defines "Affiliate" as follows:

> **"Affiliate"** means in relation to any Party, any company or legal entity which (a) controls either directly or indirectly a Party or (b) which is controlled directly or indirectly by such Party, or (c) is directly or indirectly controlled by a company or entity which directly or indirectly controls such Party.  **"Control"** means the right to exercise 50% or more of the voting rights of such company or entity.

(*Id.* ¶ 1.1.5).  The parties do not dispute that PAI is an affiliate of Petrobras and Braspetro.

Assignment Agreement for the DS-5.  (*Id.* ¶ 141).  The Assignment Agreement provided for Petrobras America to assume Braspetro's obligations under the Contract.  (Assignment Agreement ¶ 2).

Petrobras America does not dispute that it performed some diligence before executing the Assignment Agreement, including a review of the Contract terms.  (SHI SUF ¶ 142).  The parties dispute whether Petrobras American's decision to enter the Assignment Agreement was made independently of influence or control by other Petrobras entities.  Even as more facts about Operation Car Wash came to light, Petrobras America amended and extended the Assignment Agreement by a series of amendments in July 2014, August 2014, April 2015, and August 2015.  (*Id.* ¶¶ 200–207).

Initially, Petrobras America used the DS-5 to drill exploratory wells in the Cascade Field in the Gulf of Mexico.  (*Id.* ¶¶ 145–47).  After those projects were completed in December 2013, Petrobras America assigned the DS-5 to other companies until March 2015, when it was placed on an expensive permanent standby.  (PAI SUF ¶¶ 136–38; SHI SUF ¶¶ 148–52, 155).

### 5. *Operação Lava Jato* **and the Discovery of Fraud in Petrobras's Acquisitions of Samsung Drillships**

In March 2014, the public learned of a major investigation into corruption within Petrobras and the Brazilian government.  The investigation was popularly known as *Operação Lava Jato*, or Operation Car Wash.  (SHI SUF ¶ 172).[8]  In March 2014, the public learned that criminal charges had been filed against Paulo Roberto Costa, in 2007–2008 Petrobras's Chief Downstream Officer,

---

[8] The first indications of the scandal appeared in August 2013, when *Epoca*, a Brazilian magazine, reported that Petrobras officials had taken bribes with respect to a contract involving the *Titanium Explorer* drillship. (*Id.* ¶ 163).  Petrobras's internal inquiry revealed problems but not, Petrobras America contends, "bribery or corruption."  (PAI Response to SHI SUF ¶ 163).

for his role in a bribery scheme at Petrobras.  (*Id.* ¶¶ 174, 177).  That same year, Petrobras hired outside counsel to conduct an internal investigation into Operation Car Wash.  (*Id.* ¶ 178).  In November of the same year, the U.S. Securities and Exchange Commission also opened an investigation. Brazilian prosecutors requested information on "contracts and payments" from Petrobras, including contracts and payments related to drillships.  (*Id.* ¶¶ 179–180).  Around the same time, Petrobras officers received public reports that Camargo had testified that he paid kickbacks to Petrobras employees, including Costa and Duque.  (*Id.* ¶ 181).  By January 2015, the news media began to report that Cerveró, Duque, and others had been charged with a bribery scheme involving the *Petrobras 10,000* and *Vitoria 10,000* transactions.  (*Id.* ¶¶ 182–83, 193, *see also* ¶¶ 195 (referring to the July 2015 arrest of Jorge Zelada, Petrobras's Chief International Officer in 2008, and the discovery of his connection with Schmidt and Samsung), 196 (referring to news reports identifying Padilha as a "whistleblower" revealing information about corruption in contracts and transactions relating to drillships)).  Reports identified Samsung as the source of $13 million in bribes.  (*Id.* ¶ 182).  The Brazilian government continued to investigate Petrobras's conduct from 2005 to 2015.  (*Id.* ¶¶ 184–186).  Cerveró and Duque were explicit subjects of these investigations.  (*Id.*).

In March 2015, Petrobras began an internal audit into the *Petrobras 10,000*, *Vitoria 10,000*, and DS-5 transactions.  (PAI SUF ¶ 138; SHI SUF ¶ 187).  The audit generated a report, issued in May 2015, that raised questions about Padilha's involvement in the negotiations with Pride for the DS-5.  (PAI SUF ¶¶ 139–140; SHI SUF ¶ 189).  The report recommended that Petrobras inform Brazilian prosecutors of potential improprieties in the DS-5 procurement process.  Petrobras did so that same month.  (SHI SUF ¶¶ 190–91).  In June 2015, Petrobras's outside counsel made a presentation to United States Department of Justice and SEC officials about the roles Cerveró,

Duque, and Samsung played in making corrupt payments in the *Petrobras 10,000* and *Vitoria 10,000* acquisitions.  (SHI SUF ¶ 194).

In October 2015, the Brazilian authorities provided Petrobras with a sworn statement by Padilha, in which he admitted to the DS-5 bribery scheme and pointed to Cerveró, Duque, and Samsung as other participants.  (PAI SUF ¶ 141).  In August 2015, the Brazilian authorities indicated that they would charge Petrobras with crimes relating to the DS-5 transaction.  (SHI SUF ¶ 197).

Ultimately, both Cerveró and Duque were convicted of crimes relating to the DS-5 acquisition.  (SHI SUF ¶ 22).  Pedro Jose Barusco Filho, Costa, Luis Carlos Moreira, and Zelada were also convicted of crimes related to public corruption arising from their employment with Petrobras.  (*Id.* ¶¶ 22, 25, 30).  Petrobras America states that, except for Cerveró and Duque, these individuals were convicted of crimes unrelated to the *Petrobras 10,000*, *Victoria 10,000*, and DS-5 transactions.  (*See* PAI Response to SHI SUF ¶¶ 22, 25, 30–33).

In addition to the Brazilian criminal convictions, Petrobras admitted that it had violated the United States Foreign Corrupt Practices Act during 2004 to 2012.  (SHI SUF ¶ 36).  The statement of facts accompanying Petrobras's non-prosecution agreement with the United States does not include information related to the *Petrobras 10,000*, *Vitoria 10,000*, and DS-5 drillships.  (PAI Response to SHI SUF ¶ 36).  Petrobras did admit responsibility that included vicarious liability for the corrupt acts of employees Cerveró, Duque, Costa, Zelada, and Barusco.  (SHI SUF ¶ 37).

In January 2016, Petrobras America and Braspetro sent a notice to Pride terminating the Contract based on evidence of the bribery scheme.  (PAI SUF ¶ 142; SHI SUF ¶ 234).

### C.      The Pride-Samsung Arbitration

In 2016, Pride initiated arbitration in London against Samsung, asserting claims under English law for bribery, dishonest assistance, deceit, and conspiracy.[9]  (SHI SUF ¶ 238).  The tribunal issued a series of awards.  The third award—for damages—found that Samsung owed Pride $180.4 million, representing the difference in value between a legitimately procured contract and the Contract as signed ($152.8 million), as well as the bribe amount ($20 million), and Pride's legal fees in connection with the U.S. investigations into Pride's conduct and the arbitration itself ($7.2 million).  The third award did not determine prejudgment interest and costs.  After the third award, Samsung and Pride settled all of Pride's claims against Samsung for $200 million.

## III.    Procedural Posture

Samsung filed its initial complaint in this action in March 2019 and an amended complaint in September of the same year.  (Docket Entry Nos. 1, 51).  Petrobras America moved to dismiss the amended complaint.  (Docket Entry No. 52).  The court dismissed the amended complaint in June 2020 because the relevant four-year statute of limitations had run.  (Docket Entry Nos. 64, 65 (memorandum and opinion and order of dismissal)).  Petrobras America did not dispute that its claims accrued more than four years before it filed suit in 2019 but argued that the limitations period did not begin to run until it discovered the financial injury it sustained as to the DS-5. (Docket Entry No. 64 at 6).  The court rejected that argument and ruled that, under federal and Texas law, "by 2014 Petrobras knew or should have known about the bribery and corruption within the company and knew or should have known that the bribery and corruption extended to the drillship at issue here."  (*Id.* at 6–7); *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, No.

---

[9] Pride simultaneously initiated an arbitration against Petrobras America and Braspetro based on the same events and contracts.  (SHI SUF ¶¶ 238, 240).  That arbitration settled before any award on liability in August 2018.  (*Id.* ¶ 245).  The settlement did not provide for payment by either party.

H-19-1410, 2020 WL 13519238, at *4 (S.D. Tex. June 19, 2020), *rev'd and remanded*, 9 F.4th 247 (5th Cir. 2021) (per curiam).  Based on the finding that Petrobras America's claims were time-barred, the court held that further amendment would be futile and dismissed the amended complaint with prejudice.  (*Id.* at 8); *Petrobras*, 2020 WL 13519238, at *5.

Petrobras appealed, and the Fifth Circuit reversed and remanded.  (Docket Entry No. 66, 79 at 11; Docket Entry No. 80 (order)).  In the panel's view, Samsung had not established as a matter of law that Petrobras knew or should have known of its injury before March 5, 2015.  (Docket Entry No. 79 at 10); *Petrobras*, 9 F.4th at 256.

On remand, Samsung answered the amended complaint and brought counterclaims against Petrobras America in November 2021.  (Docket Entry No. 85).  Petrobras America moved to dismiss those counterclaims on the basis that they were untimely and failed to state a claim.  The court denied the motion, finding that a four-year statute of limitations applied to Samsung's contribution claims arising out of the November 2021 arbitration award.  (Docket Entry No. 131 at 22); *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 620 F. Supp. 3d 577, 590 (S.D. Tex. 2022).  Discovery and the pending summary judgment motions followed.

## IV.    The Rule 56 Legal Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the record evidence

"which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact." *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration in original) (quoting reference omitted). "However[,] the movant 'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted). The nonmovant "must identify specific evidence in the record and articulate the 'precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted). Of course, all reasonable inferences are drawn in the nonmovant's favor. *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022). But a nonmovant "cannot defeat summary judgment with 'conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting reference omitted).

V.      **Analysis**

    **A.  Petrobras's RICO Claims**

    **1.      Statutory Standing**

Samsung argues that Petrobras lacks statutory standing to assert RICO claims.  (Docket Entry No. 181 at 11).  Statutory standing for a RICO claim requires a plaintiff to demonstrate a violation of the RICO statute and an injury to its "business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c); *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 338 (5th Cir. 2021).  Statutory standing is distinct from constitutional standing in that it does not implicate the court's subject-matter jurisdiction.  *McPherson*, 8 F.4th at 339.

Samsung notes that Petrobras, Braspetro, and Petrobras America are distinct corporate entities, and that undisputed facts demonstrate that Petrobras American was not originally a party to the bribe-tainted transaction for the DS-5.  Samsung argues that the procurement through bribery of the drilling services agreement may have harmed Braspetro or Petrobras, but "RICO . . . claims embrace a standing requirement that precludes plaintiffs from recovering based on a third-party's injury."  (Docket Entry No. 181 at 12).  Samsung argues that Petrobras America's execution of the Assignment Agreement was an independent business decision, defeating Samsung's liability for any injury that Petrobras America sustained by making payments under the Contract.  Samsung argues that Petrobras America's injury is therefore "derivative" of Braspetro's or Petrobras's injuries and is insufficient to confer standing for its RICO claims.  (*Id.* at 13).

In response, Petrobras America argues that it seeks recovery for its own injury: the injury sustained by "paying hundreds of millions of dollars under a drilling contract that it did not need."  (Docket Entry No. 199 at 3).  Petrobras America notes that neither Braspetro nor Petrobras made payments under the Contract, because the Braspetro assigned the Contract to Petrobras America shortly after Samsung completed constructing the DS-5.  (*Id.*).  Petrobras America argues that

there is a dispute as to whether its decision to execute the Assignment Agreement was made independently of Braspetro and Petrobras.  (*Id.* at 4–5).

The civil RICO statute provides a cause of action to "[a]ny person injured in his business or property *by reason of* a violation" of the statute.   18 U.S.C. § 1964(c) (emphasis added). "Nothing on the face of the relevant statutory provisions imposes . . . [the] requirement" on the plaintiff to show first-party reliance on the defendant's alleged misrepresentations.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008).  The statute does not require Petrobras America to show that Samsung defrauded Petrobras America,[10] merely that it was "injured . . . by reason of" Samsung's RICO violation.

Petrobras America has statutory standing under RICO.

### 2.      Proximate Cause or Direct Relationship

"The proximate causation standard in th[e] [civil RICO] context is not one of foreseeability; instead, the plaintiff must demonstrate that the alleged violation "led directly" to the injuries.  *Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020) (quoting *Anza v. Ideal Steel Corp.*, 547 U.S. 451, 461 (2006)).

Samsung argues that the undisputed facts show that Petrobras America cannot prove that Samsung's acts directly caused the asserted injuries.  (Docket Entry No. 181 at 13; Tr. at 30:7–15).  Samsung argues that, because it paid no bribes to Petrobras America or any other party with respect to the Assignment Agreement, any injury Petrobras America suffered resulted from its own execution of the Assignment Agreement.  (Docket Entry No. 181 at 14).  Samsung also argues that "[Petrobras America] independently ratified the [Contract] when it repeatedly agreed to assume

---

[10] Samsung does not dispute that a RICO plaintiff need not show its reliance on a fraudulent representation. (Docket Entry No. 208 at 7).

Braspetro's obligations, *even after it learned of the bribes to Cerveró and Duque* and when it knew it had no work for the rig to perform." (*Id.*). Samsung argues that the general market downturn after the assignment to Petrobras America, rather than Samsung's bribery, proximately caused Petrobras America's injuries. (*Id.*).

Petrobras America argues that Samsung neglects the three-factor test used by many courts of appeal to evaluate proximate causation in the RICO context. (Docket Entry No. 199 at 6–7). Petrobras America also argues that there is a dispute as to the independence of its decision to enter into the Assignment Agreement, and as to whether the Assignment Agreement was an "intervening cause" that broke the causal chain. (*Id.* at 10). Petrobras America argues that it had no need for the DS-5 even before the market downturn, (*id.* at 15), which Samsung identifies as beginning in 2014. (Docket Entry No. 181 at 9). Petrobras America contends that it had no need for the Contract when it was executed or when it was assigned, without regard to the subsequent market downturn. (Docket Entry No. 199 at 15). Finally, Petrobras America argues that ratification is an affirmative defense and not an element of proximate cause, (*id.* at 17), and, in any event, that Samsung has not established ratification under Texas law. (*Id.* at 18).

Despite the statute's broad "by reason of" language, proximate causation is an essential element of a RICO claim. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266532 (1992) (noting "the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover" and rejecting a standard of only but-for causation). The parties dispute where the court should focus in analyzing proximate cause. Samsung argues that the Supreme Court's decisions in *Anza*, 547 U.S. 451, and *Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010), require a "direct relationship between the RICO violation and harm." (Docket Entry No. 208 at 4). Petrobras America considers those authorities but also advocates application of a three-factor test used by the Ninth Circuit in

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002), which it argues is also supported by the same Supreme Court precedents.  (*See* Tr. at 15:25–16:11).

*Anza* concerned a dispute between two companies selling steel products, supplies, and services.  *Anza*, 547 U.S. at 453–54.  "According to Ideal, [the Anza-controlled entity] adopted a practice of failing to charge the requisite New York sales tax to cash-paying customers, even when conducting transactions that were not exempt from sales tax under state law. This practice allowed National to reduce its prices without affecting its profit margin."  *Anza*, 547 U.S. at 454.  Ideal sued.  The court concluded that proximate cause was lacking, because "[t]he cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."  *Id.*  The court observed that National "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," such as receiving additional capital from a third party or accepting lower margins on its sales.  *Id.*  "[National's] lowering of prices in no sense required it to defraud the state tax authority.  Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices . . . ."  *Id.* at 448–59.  The court observed that Ideal's sales may have fallen for a number of reasons unrelated to the alleged fraud.  *Id.* at 459.

*Hemi* concerned a suit brought by New York City against Hemi, a New Mexico online retailer of cigarettes.  *Hemi*, 559 U.S. at 4.  The City was responsible for recovering taxes for such sales from the purchasers themselves, who were required by law to pay the taxes on their out-of-state purchases to the City.  *Id.* at 5.  Under federal law, Hemi was required to submit customer information to New York State, which would forward that information to the City.  *Id.* at 4–6.  The City alleged that it was harmed after Hemi failed to file this information with New York State.  *Id.* at 4–5.  The Court held that the allegations did not show that the City was injured "by reason of"

the alleged fraud.  *Id.* at 9.  Stating that RICO requires a "'direct causal connection' between the predicate offense and the alleged harm," *id.* at 10–11, the Court found that the direct cause of the City's harm was its tax-avoiding citizens, not Hemi.  *Id.* at 11.

Petrobras accepts the requirement of a "direct causal relationship," but urges the court break the requirement down into three-factor examination of the harm alleged, as follows:

> (1) [W]hether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Mendoza*, 301 F.3d at 1169.  Petrobras argues that only Petrobras America made payments under the Contract.  No other party was asserting injury under the Contract, avoiding the risk of double recoveries or complicated apportionment.  Petrobras argues that the connection is not "speculative" because Petrobras America would not have suffered the injury of making contract payments without Samsung's bribery payments.  Finally, Petrobras argues that the damages—the payments it made under the Contract—are ascertainable.  (Docket Entry No. 199 at 8).

In *Holmes*, a Clayton Act case, the Court identified the difficulties it had found in ascertaining damages and apportionment without requiring proximate causation.  *Holmes*, 503 U.S. at 269.  The Court stated that "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."  *Id.* at 269–70.  The Court noted that the same considerations applied in the RICO context.  *Id.* at 270.

The *Hemi* Court noted that "whether better situated plaintiffs would have an incentive to sue" is "one consideration we have highlighted."  *Hemi*, 599 U.S. at 11–12.  The Court noted that the State—which also imposed a cigarette tax—would have an incentive to sue, although the Court

noted that it was not deciding the viability of any claim brought by the State. *Id.* at 12. The *Anza* Court briefly discussed the risk of multiple recoveries and issues of apportionment and whether the damages suffered by indirectly harmed plaintiffs would be difficult to ascertain. *Anza*, 547 U.S. at 465–466.

The Court appears to view the *Mendoza* factors as reasons to require proximate causation and to limit RICO recovery to direct harms. *See Jackson v. NAACP*, 546 F. App'x 438, 443 (5th Cir. 2013) (per curiam) (stating that the factors identified by *Mendoza* and other cases are "[t]he underlying premises of the proximate cause requirement"); *cf. Molina-Aranda*, 983 F.3d at 784 (referring to the direct injury requirement without evaluating the *Mendoza* factors). Even if Petrobras America satisfies the *Mendoza* test, that is not by itself enough to show that Petrobras America suffered a direct harm from Samsung's bribery of Petrobras officials. The Court stated only that, "in the RICO context, the focus [of the proximate cause analysis] is on the directness of the relationship between the conduct and the harm." *Hemi*, 599 U.S. at 12. The bribery scheme in which Samsung paid Petrobras officials tainted the drilling services contract, allegedly resulting in the acquisition of a drillship that no Petrobras entity needed. Braspetro did not need the DS-5 and was a party to the Contract with Pride. Had Braspetro been injured by the unnecessary Contract, that injury would have directly flowed from Samsung's conduct.

But Braspetro is not before the court. It made no payments under the Contract. It assigned the Contract to Petrobras America. Petrobras America does not contend that Samsung bribed any of its employees, or any Braspetro or Petrobras employees, with respect to the Assignment Agreement. Assuming, without deciding, that Petrobras America was compelled to enter into the Assignment Agreement, a jury nonetheless could not find, under the standard set out by the Supreme Court, that Samsung proximately caused Petrobras America's injuries. Those injuries

occurred because Petrobras America had to assume Braspetro's obligations under the Contract. Braspetro or Petrobras caused Petrobras America to assume those obligations, not Samsung. Samsung's conduct did not directly injure Petrobras America.  As in *Anza*, the act causing the injury—the assignment of an unnecessary drillship to Petrobras America—was not the wrongful conduct.  The wrongful conduct was Samsung's payment of bribes to Petrobras officials to secure the contract to build the DS-5.

The Supreme Court has stressed the importance of direct harm over foreseeability in the RICO context.  *Hemi*, 599 U.S. at 12.  But there is also a lack of foreseeability as to Petrobras America.  Harm to Braspetro, on the other hand, was foreseeable to Samsung.  Petbrobras America makes this argument in its motion for summary judgment:

> After Braspetro was fraudulently induced into a five-year commitment for a drillship it did not need, it was reasonably foreseeable that it would suffer losses by being saddled with a long-term contract it did not need. [Petrobras America's] sporadic use of the drillship to mitigate such damages does not change the fact that there was never a need for a five-year commitment.

(Docket Entry No. 177).  As quoted, "it was reasonably foreseeable that [*Braspetro*] would suffer losses. . . ."  (*Id.*).  It was not reasonably foreseeable that Braspetro would assign the DS-5 to a related entity that had no need for it.  Once constructed and deployed, the DS-5 was a drillship like any other.  Petrobras America does not contend that the bribery tainted the very nature of the DS-5, making it unusable for any purpose of any potential Contract assignee.  As Samsung's counsel argued, "[t]here is no evidence that the [Contract] contained any corrupt or harmful terms to Pride."  (Tr. at 67:16–17).  Had Braspetro assigned some other drilling services contract to Petrobras America—a contract for a similar drillship untainted by any illegality—Petrobras would still have been injured.  The harm to Petrobras America is too attenuated from the bribery scheme itself to serve as a basis for RICO liability.

Petrobras America argues that the "assignment of the DS-5 was explicitly contemplated in the [Contract], such that there was never any question that **some** [Petrobras] entity other than Braspetro would be stuck with the DS-5 upon delivery." (Docket Entry No. 199 at 10). That the parties contemplated assigning the Contract does not mean that Braspetro would assign the Contract to another Petrobras entity. The Contract on its face permits assignment to any entity, provided Braspetro gave notice to Pride and Pride gave its consent. The text of the Contract does not support the claim that Samsung's conduct directly caused Petrobras America's injury. While there is no dispute that Petrobras America was the only Petrobras affiliate to pay anything under the Contract, nothing in the Contract required that result. Petrobras America does not point to authority holding that the court must consider the identity of the payor under an unlawfully procured contract when determining whether a RICO injury was the direct result of unlawful conduct. Petrobras America has not identified record evidence demonstrating that, during the negotiations and execution of the Contract, the parties contemplated that Petrobras America would receive the drillship by assignment several years later.

At oral argument, Petrobras America's counsel stated that "Braspetro was never going to operate this rig" and that "Petrobras America was the entity best situated to take on this contract." (Tr. at 10:17–22). But the evidence cited in support of this argument, the declaration of Petro Albuquerque, (Docket Entry No. 197-7), does not create a factual dispute that precludes summary judgment. Albuquerque stated that "[t]here was never any question that Braspetro would assign the [Contract] to some subsidiary that actually engages in drilling operations." (*Id.* ¶ 6). He also stated that "[p]rior to the Assignment Agreement, Braspetro planned to assign the [Contract] to any Braspetro subsidiary that could utilize the DS-5," and that "[t]he assignment of the [Contract] to PAI . . . was a [Petrobras] decision that sought to mitigate Braspetro's overall losses." (*Id.* ¶¶ 8–

9).  That Braspetro had already decided that it would assign the Contract does not mean that it would assign the contract to Petrobras America.  Albuquerque's declaration shows that the decision to assign the Contract to Petrobras America was made only after the Contract's execution.

The parties dispute whether Petrobras America's acceptance of the Contract by assignment was an independent business decision on the part of Petrobras America.  Samsung argues that it was; Petrobras America argues that the Petrobras group's structure meant that it had no choice.  Petrobras America does not ask the court to perform a veil-piercing analysis.  (Tr. at 11:14–20).  As a legally distinct entity, Petrobras America cannot simply stand in Braspetro's shoes, even if Braspetro contemplated the assignment of the Contract to one of its subsidiaries.  The record does not show, the text of the Contract does not require, and counsel does not argue, (*id.* at 21:15–19), that Braspetro necessarily intended Petrobras America be that assignee when the Contract was executed as a result of the bribery scheme.  When the Contract was assigned, Braspetro thought the DS-5 would be assigned to a subsidiary licensed to operate in Angola, not Petrobras America.  (*Id.* at 11:21–12:1).  Finally, the argument that the particular assignee is of no moment because no Petrobras entity could profit from the DS-5's use, (*id.* at 21:21), has to do with the failure of Petrobras's drilling prospects at the time—not Samsung's wrongdoing.  Samsung's bribery scheme did not affect the presence of economically feasible recoverable oil off the coast of Angola or in the Gulf of Mexico.

Samsung's bribery was a but-for cause of Petrobras America's alleged injuries.  But RICO requires a plaintiff to show both but-for and proximate causation.  *Hemi*, 559 U.S. at 9.  Samsung bribed Petrobras officials to ensure that Braspetro executed the Contract with Pride.  Faced with delivery of a drillship it did not need, Braspetro and Petrobras assigned it to Petrobras America.  In Petrobras America's own words, the "assumption of the [Contract] was part of a broader

24

decision by [Petrobras] in coordination with its subsidiaries as the best way to mitigate damages arising from an unnecessary contract, and was largely beyond its control." (Docket Entry No. 199 at 10). The question of assignment was discussed within Petrobras. It is immaterial whether the assignment was made to mitigate the losses of Petrobras entities, or whether Petrobras America had little say in this decision. Petrobras America cannot hold Samsung liable for its alleged damages under RICO.

The court grants Samsung's motion for summary judgment on Petrobras America's RICO claims because Petrobras America cannot show that Samsung proximately caused its losses.

## B.     Samsung's Contribution Counterclaim

Petrobras America's motion asks the court to dismiss Samsung's counterclaim seeking contribution with respect to the settlement agreement between Samsung and Pride. The parties agree that English law applies to the counterclaims and have each provided expert reports on that law.

Under English law, the Civil Liabilities (Contribution) Act of 1978, c.47, applies to Samsung's claim. The Act provides:

> Subject to the following provisions of this section, any person liable in respect of any damage suffered by another person may recover contribution from any other person liable in respect of the same damage (whether jointly with him or otherwise).

(Docket Entry No. 214-3, First Expert Report of Richard Millet, K.C., dated Jan. 27, 2023 ("First Millet Report") ¶ 20 (quoting Act § 1(1))). The Act instructs courts to consider the parties' relative culpabilities with respect to the amount of any contribution awarded:

> [I]n any proceedings for contribution . . . the amount of contribution recoverable from any person shall be such as may be found by the court to be just and equitable having regard to the extent of that person's responsibility for the damage in question.

(*Id.* (quoting Act § 2(1))).

1.      **"The Same Damage"**

Petrobras America argues that Samsung cannot show that it is "liable in respect of the same damage," as that phrase is used in the Act.  (Docket Entry No. 177 at 31).  Samsung seeks contribution for its liability for the settlement reached after its arbitration against Pride.  Petrobras America argues that the settlement reflected "Pride's losses as a result of obtaining a [Contract] that was 'tainted' by Samsung's bribery scheme, and as a result [Petrobras America's] early termination of that contract."  (*Id.* at 32).  Petrobras America argues that it cannot be held liable in contribution for its valid and lawful termination of the Contract.  (*Id.*).  It points to cases supporting a "strict[]" interpretation of "the same damage."  (*Id.* at 42).  To be "the same damage" under the Act, Petrobras America argues, the party seeking contribution must "show[] that the causation and measure of damage are the same."  (*Id.*).  Petrobras America asks the court to understand "damage," as used in the Act, as what the tribunal found to be the proper measure of loss to Pride: "the difference in value between a tainted and an untainted drilling contract."  (*Id.* at 43 (quoting Docket Entry No. 182-8, Exh. 65, Third Partial Award (Remedies and Quantum) ("Third Award") ¶¶ 104 & 161, *Ensco Global IV Ltd. v. Samsung Heavy Indus. Co., Ltd.* (May 3, 2019) (Schaff, K.C., Dr. Peter, Sutton, arbs.))).

Samsung argues that "damage," as used in the Act, refers to harm more broadly and not to a specific amount payable as legal damages.  (Docket Entry No. 194 at 46).  Samsung argues that, in the context of this litigation, "damage" must be understood as referring to "the harm [Pride] suffered from having a tainted [Contract]."  (*Id.* at 47).  Samsung argues that whether Petrobras America properly exercised a right to terminate the Contract raises at most fact issues relevant to Petrobras America's liability or the apportionment of the parties' liability to Pride.  (*Id.* at 48).

To be clear, the Third Award found that "[t]here is no relevant distinction so far as an award of damages is concerned between the different causes of action."  (Third Award ¶ 133).  All

entitled Pride to a "full compensatory remedy." (*Id.*; *see also* ¶ 156 ("Where a tribunal determines, without speculation, what would have happened but for the fraud, . . . then the compensatory principle makes it just that damages should be assessed on that basis.")).

In *Royal Brompton Hospital NHS Tr. v. Hammond (No. 3)* [2002] 1 WLR 1397, the House of Lords affirmed the dismissal of an architect's claim for contribution against a contractor relating to the parties' liabilities to the plaintiff hospital for the delayed completion of a building.  Lord Bingham first observed that the Act's "'damage' does not mean 'damages.'" (*Id.* ¶ 6 (citing *Birse Construction Ltd. v. Haiste Ltd.* [1996] 1 WLR 675, 682)).  The contractor did not complete the project on time, exposing it to liquidated damages under the contract; however, the contract also provided that the architect could grant the contractor extensions of time that would relieve the contractor of its liability for those liquidated damages.  (*Id.* ¶¶ 11–12).  The architect granted several extensions.  The contractor and the hospital resolved their dispute.  The hospital sought recovery against the architect for the architect's negligence in taking certain actions that extended the timeline.  The hospital also sought to hold the architect liable for the liquidated damages from which the architect had relieved the contractor of responsibility.

Lord Steyn characterized the hospital's claim against the contractor as arising from "the late delivery of the building." (*Id.* ¶ 22).  On the other hand, "[t]he essence of the case against the architect is the allegation that his breach of duty changed the employer's contractual position detrimentally as against the contractor.  The employer's case is that the architect wrongly evaluated the contractor's claim for an extension of time." (*Id.* ¶ 23).  Interpreting "damage" as "harm," the lords unanimously found that the claim against the contractor—the gravamen of which was the delay in completion—involved separate "damage" than the claim against the architect. (*Id.* ¶¶ 8, 9, 35, 48–49).

This case is distinguishable from *Royal Brompton Hospital*.  Samsung seeks contribution from Petrobras America because, even assuming that Petrobras America had nothing to do with the procurement of the Contract:

> [Petrobras America] nonetheless became a participant in—and fully liable in contribution under English law—when it knowingly undertook and affirmed a tainted [Contract] pursuant to the scheme.  Or in simpler terms, [Petrobras America] was treated under English law as responsible for the illegal conduct that preceded its knowing acceptance of a fraudulently procured good.

(Docket Entry No. 194 at 36).  Petrobras America's expert attempts to distinguish the harms, as follows:

> In short, the damages paid by [Samsung] to [Pride] were based on the loss to [Pride] of receiving a tainted contract . . . , i.e. one which Braspetro, and later [Petrobras America] as assignee . . ., was entitled to avoid based on the acts of Cervero and Duque.  By contrast, in its counterclaim, [Samsung] seeks to recover damages from PAI based on the attribution of Cervero and Duque's acts to [Petrobras America]. That is not, however, the same "damage" that it paid to [Pride], and therefore cannot be the basis for a claim for contribution under Section 1(1) of the Act.

(First Millet Report ¶ 69).  But Cerveró and Duque's acts, of course, contributed to the execution of the tainted Contract—the basis of Pride's claim against Samsung.  Whether Petrobras America may be held liable for the corruption of Cerveró and Duque is a different question from whether Samsung's claim against Petrobras America involves "the same damage."[11]  Whether Samsung can succeed on its claim against Petrobras America is also separate from the question of whether the claim seeks "the same damage."  The tribunal identified Samsung's unlawful procurement of the Contract as Pride's "damage."  The tribunal awarded damages measured by the difference between what it cost Pride under the tainted Contract and what Pride would have paid under an

---

[11] Similarly, the court agrees with Samsung's argument, (Docket Entry No. 194 at 48), that the question of whether PAI was within its rights to terminate the Contract speaks to liability or apportionment rather than the analysis of "the same damage."  (*See* First Millet Report ¶¶ 72–74 (arguing that, because Pride's claim against Samsung was premised on PAI's valid termination of the Contract, PAI cannot be liable with respect to "the same damage.")).

untainted contract.  Samsung alleges that Petrobras America knew that the Contract was tainted, and therefore avoidable, resulting in harm to Pride.  The harm is the same: an injury caused by a terminable (or at least allegedly terminable) Contract.[12]

### 2.    Petrobras America's Potential Liability

The parties do not dispute the elements of the potential bases for contribution that Samsung identifies: the tort of bribery, conspiracy to injure by unlawful means, and dishonest assistance. As Petrobras America argues, and as Samsung does not seriously dispute, (Docket Entry No. 194 at 35), Petrobras America cannot be held liable on the basis that it assisted in the procurement of the Contract, because Petrobras America had no hand in the acts of bribery themselves.  Samsung instead argues that Petrobras America:

> nonetheless became a participant in—and fully liable in contribution under English law—when it knowingly undertook and affirmed a tainted [Contract] pursuant to the scheme.  Or, in simpler terms, [Petrobras America] was treated under English law as responsible for the illegal conduct that preceded its knowing acceptance of a fraudulently procured good.

(*Id.* at 36).

As Samsung observes, "the [English-law] experts largely agree on the applicable law." (Docket Entry No. 227 at 1–2).  Both experts point to *Fish & Fish Ltd. v. Sea Shepherd UK* [2015] A.C. 1229, as providing the standard for joint liability in tort.  That case states that a plaintiff must show:

> First, the defendant must have assisted the commission of an act by the primary tortfeasor; secondly, the assistance must have been pursuant to a common design on the part of the defendant and the primary tortfeasor that the act be committed; and, thirdly, the act must constitute a tort as against the claimant.

---

[12]  The question of whether "the same damage" is at issue is also distinct from the question of the parties' relative liability for that damage.  (*See id.* ¶ 23 (explaining that a court has "broad discretion" about how to apportion liability between tortfeasors" with respect to contribution claims under the Act)).

29

*Id.* ¶ 55.  Additionally,

> [a]s to the third condition, it is unnecessary for a claimant to show that the defendant appreciated that the act which he assisted pursuant to a common design constituted, or gave rise to, a tort or that he intended that the claimant be harmed.  But the defendant must have assisted in, and been party to a common design to commit, the act that constituted, or gave rise to, the tort.  It is not enough for a claimant to show merely that the activity, which the defendant assisted and was the subject of the common design, was carried out tortiously if it could also perfectly well be carried out without committing any tort.  However, the claimant need not go so far as to show that the defendant knew that a specific act harming a specific defendant was intended.

*Id.* ¶ 60.  Samsung also identifies "conspiracy to injure by unlawful means" as a basis for Petrobras

America's contribution liability.

> A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so.

(Docket Entry No. 198-1, First Expert Report of Steven Mark Gee, K.C., dated January 31, 2022

("First Gee Report") ¶ 59 (quoting *FM Cap. Partners Ltd. v. Marino* [2018] EWHC 1798 ¶ 93)).

Finally, "dishonest assistance" is a kind of "accessory liability," not an independent tort, that

"depends on the defendant's wrongful participation in a primary breach committed by the trustee

[*i.e.* the fiduciary]."  JOHN MCGHEE ET AL., SNELL'S EQUITY ¶ 30-077 (34th ed.); *see also* PAUL

MCGRATH, COMMERCIAL FRAUD IN CIVIL PRACTICE ¶ 16.114 (For the defendant to be held liable,

"[i]t suffices if he simply knows that he is assisting the main fraudster to do something he is not

entitled to do.").  Both parties' experts agree that establishing liability for dishonest assistance

requires showing (1) a fiduciary relationship, (2) a breach of the fiduciary duty, (3) that the

defendant's procurement or assistance had some causal effect on the fiduciary's behavior, and (4)

that the procurement or assistance was dishonest.  (First Millet Report ¶ 38; First Gee Report ¶ 57

(citing *Marino*, EWHC 1768 ¶ 82)).

The parties' experts agree that the three bases for contribution that Samsung identifies have common elements.  For both joint liability with respect to the tort of bribery, and for conspiracy to injure and dishonest assistance, Samsung must show what is variously called a "common design," "combination or agreement," or "assist[ance]" from Petrobras America that resulted in harm to Pride, or, in the words of Petrobras America's expert, some kind of "concerted action."  (Docket Entry No. 214-3, Second Expert Report of Richard Millet, K.C., dated May 10, 2023 ("Second Millet Report") ¶ 24).   Unfortunately, the precise meaning of this element has "never been defined."  (Docket Entry No. 227-3, Deposition of Steven Mark Gee, K.C. at 85:17).

Petrobras America observes that Samsung's counterclaim turns on finding that, in 2015, Petrobras America engaged in some kind of concerted action with Samsung with respect to a bribery scheme in which all the bribes were paid, and the object of the scheme obtained, in 2008. (Docket Entry No. 21).  The benefit Samsung sought to obtain was the purchase of the DS-5 from Pride.  Petrobras America claims that the scheme ended, at the latest, in 2011, with the delivery of the DS-5.

The court finds Samsung's argument that the scheme persisted through Amendment No. 4 to the Assignment Agreement less convincing.  The Third Award found that Samsung owed Pride the "difference in value between a tainted and an untainted drilling contract."  Petrobras America argues that it cannot be liable because "there is no evidence that [it] had any knowledge of, much less any involvement in, the bribery scheme."  (Docket Entry No. 215 at 18–19).  The court agrees with both Petrobras America's narrower conception of the scheme and the legal conclusions that flow from it.  The Contract was tainted because Samsung bribed Petrobras officials in 2008. Petrobras America's subsequent performance under the assigned Contract did not make it any more or any less tainted.  Petrobras America based its termination on the taint associated with the

Contract, but termination did not change the nature of the Contract.  Samsung's theory of liability requires it to show that Petrobras America contributed to a scheme that resulted in Pride's execution of a contract that could be unilaterally terminated by Petrobras America.

As Samsung's own expert states:

> It is not sufficient in English law to prove that a defendant facilitated tortious conduct or even knowingly did so, unless there is also the element of agreement or arrangement or plan or concerted action with another to participate in the tortious scheme.

(Docket Entry No. 227-4, Fourth Expert Report of Steven Mark Gee, K.C., dated April 14, 2023 ("Fourth Gee Report") ¶ 61).  This statement appears consistent with Millet's opinion on the same issue.  (Docket Entry No. 227-1, Deposition of Richard Millet, K.C. at 210:12–17 (defining "concerted action" as meaning "[a]cting together"), 211:16–23 ("Q:  Is it your understanding that [Samsung] must show that [Petrobras America] expressly coordinated its actions with other tortfeasors?  A:  I don't think you need to go quite that far, but you do need to show that it's joint in some way.  There's a—that it's participatory.  Intentional coordination, I think, is normal but it's not essential . . . .")).  Petrobras America's actions with respect to the bribery scheme, combined with the nature and timing of the scheme, defeat Samsung's attempts to show that Petrobras America engaged in concerted action with respect to the harm that Samsung caused Pride.  Gee opines that "[o]nce [Petrobras America] knew that the [Contract] had been obtained by [Samsung's] bribery of Padilha, no orders could have been given honestly by [Petrobras America ] for services under the [Contract] without first making at the relevant date full disclosure of all the material circumstances to [Pride], [Petrobras America] could not have used or retained the rig," or "negotiated for or agreed to extend the term of the [Contract]."  (*Id.* ¶ 63).  But Gee provides no authority for this statement, and, on these facts, it is unpersuasive.

Samsung attempts to show Petrobras America's contribution to the scheme by demonstrating its knowledge of the scheme before it signed Amendment No. 4 to the Assignment Agreement. (Docket Entry No. 194 at 37 (arguing that, under English law, "[w]hat matters is whether the late-comer [to the scheme] knowingly acts in service of a common end, a factual question which may be . . . inferred from [the late-comer's] conduct, knowledge, and circumstances")). Samsung argues that "[Petrobras America] knew of the material facts of the DS-5 bribery at least ten days [that is, August 17, 2015] before it entered Amendment No. 4." (*Id.* at 37). Samsung also points to the audit report, dated May 18, 2015, in which Petrobras (not Petrobras America) "identif[ied] irregularities and suspected improprieties in the [Contract's] procurement." (*Id.* at 38). As evidence, Samsung points to the audit report, the federal indictment delivered to PAI that "mention[s] [Pride] DS-5," (*id.* at 24), and "the extensive public reporting . . . on the DS-5 bribery investigation." (*Id.* at 24 n.9).

Petrobras America disputes that Samsung can show knowledge of the tainted contract before Petrobras America entered into Amendment No. 4. (Docket Entry No. 215 at 18–19).[13] But even assuming that Petrobras America had knowledge that the Contract was tainted by bribery, the court finds little significance in its continued performance under Amendment No. 4. Samsung argues that the amendment "prolonged" the bribery scheme; however, the amendment neither prolonged the term of the five-year Contract nor diminished Petrobras America's obligations to Pride. Although the English-law authorities make clear that Samsung need not show that Petrobras

---

[13] Petrobras America argues that "Samsung cannot establish that the Indictment was ever sent to or received by any person at PAI responsible for approving Amendment No. 4." (Docket Entry No. 215 at 18). PAI argues that indictment was merely a complaint and did not conclusively establish key facts surrounding the alleged bribery, such as whether Pride itself was involved. (*Id.*). PAI also argues that "[t]o the extent Samsung relies on 'extensive public reporting' beginning in July 2015 to establish PAI's knowledge of the relevant facts," Samsung's argument is "self-defeating . . . [because] if public reporting sufficed to put PAI on notice of the relevant facts, it must follow that Pride was on notice too." (*Id.* at 19).

America provided a high level of assistance to the scheme, the record does not show any assistance from Petrobras America with respect to Pride's injuries.

The question is whether Samsung can obtain contribution from Petrobras America for Pride's injury: the difference between a tainted and untainted drilling contract.  It cannot.  Perhaps Petrobras America should have promptly notified Pride that the Contract was potentially tainted.  Perhaps it may be held liable to Pride for not doing so.  But Petrobras America cannot be held liable in contribution to Samsung on this record because the evidence does not support finding that Petrobras America engaged in "concerted action" with respect to Samsung's bribery scheme.

The undisputed facts do not support Petrobras America's liability in contribution to Samsung.

## VI.    Conclusion

This case spans years.  It involves transactions that launched massive and expensive drill ships around the world, made by companies participating in an international industry that is central to modern life.  It presents difficult questions of American and English law.  Counsel have worked hard and long to present their cases to the court, and they have done so ably.  It is perhaps anticlimactic for the court to find that neither side can win the relief it seeks.  The court believes that this is nonetheless the correct outcome.

The court: (1) grants Samsung's motion for summary judgment, (2) grants in part Petrobras America's motion for summary judgment with respect to Samsung's counterclaim, and (3) otherwise denies Petrobras America's motion for summary judgment.

Because the court's opinion disposes of all the claims in this case, final judgment will be entered by separate order.

SIGNED on August 11, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge